

2008 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

9-23-2008

# USA v. Grant

Precedential or Non-Precedential: Non-Precedential

Docket No. 06-4231

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2008

Recommended Citation
"USA v. Grant" (2008). *2008 Decisions*. Paper 502.
http://digitalcommons.law.villanova.edu/thirdcircuit_2008/502

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 2008 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 06-4231

UNITED STATES OF AMERICA

v.

ROGEL GRANT,

Appellant

Appeal from the United States District Court
for the Eastern District of Pennsylvania
(Crim. No. 04-cr-00749)
District Judge: Hon. James Knoll Gardner

Before: McKEE and GARTH, <u>Circuit Judges</u>,
and RODRIGUEZ,<sup>*</sup> <u>District Judge</u>

Submitted pursuant to Third Circuit LAR 34.1(a)
May 15, 2008

(Opinion filed: September 23, 2008)

OPINION

McKEE, <u>Circuit Judge</u>.

Rogel Grant appeals the district court's judgment of conviction and sentence

entered on September 19, 2006.  For the reasons that follow, we will affirm.

---

*The Honorable Joseph H. Rodriguez, Senior District Judge, United States District Court for the District of New Jersey, sitting by designation.

1

Because we write primarily for the parties, we need not recite the facts or procedural history of this case except insofar as may be necessary for our brief discussion. On April 5, 2005, a grand jury returned a superseding indictment charging Rogel Grant and nine co-defendants with conspiracy to distribute crack cocaine, in violation of 21 U.S.C. § 846,[1] and related offenses. In addition, Grant was charged with four counts of distribution of crack cocaine and one count of possession of crack cocaine with the intent to distribute, in violation of 21 U.S.C. § 841(a)(1).

On January 3, 2006, Grant went to trial with co-defendant Antoine Shirley. At the close of the government's evidence, Grant moved for judgment of acquittal pursuant to Fed.R.Crim.P. 29. The district court granted the motion as to the conspiracy charge[2] but denied it as to the remaining charges. On January 11, 2006, the jury returned a verdict finding Grant guilty of two counts of distribution of crack cocaine and one count of possession of crack cocaine with the intent to distribute. The jury acquitted Grant of two counts of distribution of crack cocaine.

On September 19, 2006, the district court overruled Grant's objections to the government's information charging prior convictions for felony drug offenses, pursuant to 21 U.S.C. § 851, and imposed a sentence of life imprisonment, a term of supervised

---

[1]The superseding indictment charged that Grant was a member of the "Welmaker Crack Cocaine Distribution Organization."

[2]*See* n.1, *supra*.

release of ten years, and a special assessment of $300.  This appeal followed.

## II.

Grant makes four arguments in support of his appeal.  Each is considered separately below.

### A. The Government's Closing Argument Was Improper.

Grant contends that the Assistant United States Attorney improperly summarized the testimony relating to the fourth drug transaction during closing argument. Specifically, the AUSA said:

> And then, October 26, 2004.  Again, a call to the same telephone number, arrange to meet in the Burger King lot, the video is set up, but this time there's a different plan.  This time the detectives plan to arrest the person that has been delivering, over these past three occasions, to Detective Karnes.  And they set up, they order up, they order three ounces.  They order, actually, three or four ounces, I believe the testimony of Detective Karnes was.  They ordered three or four ounces.  When you're doing this, you'll want somebody to come up with as much drugs as you can get, so, you know, have a real solid case, you order up, and that's what they did.

App. 81.  Grant submits that the AUSA impermissibly vouched for his witnesses in arguing: "When you're doing this, you'll want somebody to come up with as much drugs as you can get, so, you know, have a real solid case, you order up, and that's what they did."  Grant claims this statement "invit[ed] the jury to rely upon 'special knowledge unique to the prosecutor' to draw the conclusion that the increasingly large undercover drug purchases somehow rendered the case against [him] and his co-defendant 'real solid.'"  Grant's Br. at 24.  The argument is meritless.

3

Generally, a prosecutor may not vouch for the credibility of a government witness or express his personal opinion concerning the guilt of the defendant. *United States v. Beaty*, 722 F.2d 1090, 1097 (3d Cir. 1983). In order to find improper vouching, two criteria must be met: "(1) the prosecutor must assure the jury that the testimony of a Government witness is credible; and (2) this assurance is based on either the prosecutor's personal knowledge, or other information not contained in the record." *United States v. Walker*, 155 F.3d 180, 187 (3d Cir. 1998). "[I]t is not enough for a defendant on appeal to assert that the prosecutor assured the jury that a witness' testimony was credible." *Id*. "The defendant must be able to identify as the basis for that comment an explicit or implicit reference to either the personal knowledge of the prosecuting attorney or information not contained in the record." *Id*. Moreover, the prosecutor may "argue reasonable inferences based on the evidence." *United States v. Necoechea*, 986 F.2d 1273, 1276 (3d Cir. 1993). In addition, there is a distinction between expressions of personal opinion based on the evidence and those based on facts not in evidence. *United States v. Gallagher*, 576 F.2d 1028, 1042 (3d Cir. 1978). If the statements are based on the evidence, prejudice must be shown before reversal is warranted. *Id*.

Here, the AUSA's statement was a fair summary of the evidence, which showed that on September 28, 2004, the detectives had purchased 6 grams of crack cocaine; on October 12, 2004, they had purchased 5.2 grams of crack cocaine; and on October 14, 2004, they had purchased 28.3 grams of crack cocaine from the individual identified to

4

them as "Bradley," an alias used by Grant. However, on October 26, 2004, the date on

which they intended to arrest "Bradley," the detectives had a new plan. Detective

Meitzler testified:

Q: . . . Now, Detective on October 16 of 2004, was there another event in
this investigation?

A: October 26th?

Q: I'm sorry. October 26th –

A: Yes.

Q: – of '04?

A: Again, myself and Detective Karnes, and other detectives, Task Force
members in the Reading police met at our office. It was decided that we
were going to attempt to arrest Mr. Rogel Grant that day.

Q: And did that cause you to do anything differently?

A: A few different things that day. When we met with Scott Fitzcharles
[the confidential informant]. I advised him that we were going to arrest Mr.
Grant that day. I also advised him that we would have a listening device in
the vehicle for the officer's safety, and we also had requested a larger
amount of drugs.

Q: Do you recall what amount you requested, amount of drugs?

A: Three to four ounces worth of crack cocaine.

Q: And what would you expect to have to pay for three or four ounces of
crack cocaine in Reading?

A: Between three to $4,000, so it was a significant purchase.

Supp. App. 50-51.

In light of this testimony, the AUSA's statement was clearly based on the evidence. The prosecutor did not vouch for any witness. It was reasonable to infer, and therefore to argue, that the decision by the detectives on October 26, 2004, to order a quantity of drugs that was three to four times the amount of the previous purchase, and at least 14 times the quantity involved in the first two purchases, was based on their desire to obtain a significant or "solid" case against Grant. Moreover, the statement was not prejudicial, given that Grant was arrested in the Burger King parking lot immediately after he gave three ounces of crack cocaine to Detective Karns, and while he was in possession of an additional ounce of crack cocaine.[3]

Grant also argues that the AUSA improperly argued in closing that, despite the fact that the district court granted his motion for a judgment of acquittal on the Welmaker conspiracy charge, Grant was likely involved in a conspiracy with someone else because he was not arrested in possession of the cell phone that the undercover officers called to arrange the drug buys.

In closing, the AUSA said, in relevant part:

Now, it may be argued to you that, Well, wait a minute, when Rogel Grant is caught at the Burger King lot, he doesn't have a cell phone, 484-400-

---

[3]We note that Grant did not object to the AUSA's statement in the district court. Thus, it is his burden to establish plain error. *United States v. Olano*, 507 U.S. 725, 734-35 (1993). In order to meet his burden, Grant must prove that (1) the court erred; (2) the error was obvious under the law at the time of review; and (3) the error affected substantial rights, that is, the error affected the outcome of the trial. *United States v. Johnson*, 520 U.S. 461, 467 (1997). Here, Grant cannot show error, let alone plain error.

6491, he's got some other cell phone, so it must have been somebody else.

Well, think about that. Rogel Grant may not be part of a conspiracy with the Welmakers, but he's clearly in a conspiracy with somebody.

App. 83. Grant objected to this at trial, claiming that the government's argument was not based on evidence in the record.

In response, the district court gave a curative instruction, reminding the jury that it had dismissed the conspiracy charge against Grant involving the Welmaker organization. However, the district court stated that whether Grant conspired with others might be relevant to the remaining distribution charges, and that it was for the jury to decide whether Grant conspired with anyone and to accept or reject the government's argument. The district court said:

> All right. Ladies and gentlemen of the jury, Rogel Grant has been – the charge of conspiracy against Rogel Grant has been dismissed, the charge that he conspired with people in the organization, the alleged organization that has been referred to as the Welmaker organization, you have nothing to determine concerning that. Whether or not Rogel Grant conspired with other persons, it would appear to me, would be irrelevant to any conspiracy charge against him.
>
> It might, however, be relevant to charges of distribution against Rogel Grant. There's a dispute between the parties as to whether there is any evidence that Rogel Grant conspired with anyone, whether in or out of the Welmaker organization. That's going to be for the jury to determine.
>
> If you conclude that there is evidence to support such an argument, you may consider the Government's argument. If you conclude that there's no evidence that he conspired with anyone, you should reject and not consider the Government's argument.
>
> And, so, the objection is sustained in part and overruled in part, consistent

7

with that instruction.

App. 84. Grant did not object to this instruction.

The AUSA then resumed his discussion on this issue by referring to evidence that, on prior occasions, Grant had been driven to the Burger King parking lot (where he then delivered drugs to the confidential informant) in two difference vehicles, by a driver or drivers unknown. The AUSA intimated that the cell phone in question may have remained with the person or persons in the vehicle. App. 85. Grant did not object.

In his appeal, Grant contends that the district court's curative instruction "could only have obfuscated the fact that [he] was no longer being charged with conspiring with the Welmaker organization, insofar as it suggested that the jury could find otherwise." Grant's Br. at 26. We disagree and find that the AUSA's argument was proper.

At the time of his arrest, Grant was not in possession of the cell phone that had been used to arrange the drug purchases. The government anticipated that Grant would, as he did, argue that the fact that he did not have the cell phone used to order the drugs at the time of his arrest undermined the case against him. Thus, it was appropriate for the government to argue that the absence of the cell phone could be explained by the evidence that Grant was working with others who may have had the phone.

And, the government's argument was supported by the government's evidence that suggested that Grant was not working alone. That evidence consisted of the testimony of surveillance officers who observed Grant arrive at the Burger King parking lot on

September 28, 2004 in a Chrysler driven by an unidentified person, and on October 12, 2004 in an Eagle Vision driven by a person identified by Officer Kerr as Garcia Nesta Venson. On October 14, 2004, Grant drove the Eagle Vision to the meeting with Detective Karns and the confidential informant. On October 26, 2004, approximately an hour before Grant's arrest, Detective Vega videotaped Grant arriving at the Burger King lot as a passenger in the Eagle Vision, driven by an unidentified person. Grant was seen leaving the vehicle, meeting with another unidentified person, going with that person to the men's room of the Burger King, and leaving the men's room a short time later. Grant was then seen reentering the Eagle Vision which left the parking lot.

This testimony supported the government's inference that Grant was working with, i.e., conspiring with – others in the distribution of drugs. Thus, the AUSA's argument to that effect was not improper or prejudicial. Moreover, both the AUSA's statement and the district court's curative instruction made it clear to the jury that the government's argument did not suggest that Grant was involved in the Welmaker conspiracy. In addition, any possible prejudice was greatly lessened by the curative instruction, to which Grant did not object. Nor did he request any further curative instruction. Finally, we are hard-pressed to understand how the jury could have been confused by the curative instruction, or how Grant could have been prejudiced by it, because there was no charge of conspiracy pending against Grant.

**B.  The District Court's Charge Did Not Fairly And**

9

**Adequately Submit the Issues To The Jury.[4]**

Grant argues that the district court's charge incorrectly and prejudicially suggested that he could be found guilty of a conspiracy charge that the district court had already dismissed. He contends that the use of the word "defendants" by the district court on five occasions during its explanation of the crime of conspiracy was prejudicial because it suggested that he participated in the Welmaker conspiracy, despite the fact that the Welmaker conspiracy charge was dismissed as to him. We disagree because it is clear that the instructions on the conspiracy charge applied only to Grant's co-defendant Shirley.

The district court began its instructions on conspiracy by noting that Count One of the superseding indictment charged that "Kelvin Welmaker, Jamarr Delmont Welmaker, Julian Acosta, Michael Keith Bowen, Dante Jackson, Randy Dale Jackson and Luis Daniel Marerro, and Antoine Shirley, conspired and agreed together" to distribute cocaine

---

[4]"In reviewing whether a district court in its charge to the jury correctly stated the appropriate legal standard, our review is plenary." *United States v. Johnstone*, 107 F.3d 200, 204 (3d Cir. 1997). "A jury charge must clearly articulate the relevant legal standards." *Id*. "It must, therefore, be structured in such a way as to avoid confusing or misleading the jury." *Id*. "To ensure that the district court met this requirement, we must examine the charge in its entirety and not limit ourselves to particular sentences or paragraphs in isolation." *Id*.

Our review of the particular language employed by the district court in its charge is for abuse of discretion. *Id.*

Where, as here, an allegation of error in a jury instruction that is raised on the first time on appeal is subject to plain error review. *United States v. Turcks*, 41 F.3d 893, 897 (3d Cir. 1994).

base. App. 171. Significantly, Grant was not mentioned. A short time later the district court made it even more clear that Grant was not involved when it stated: "The alleged co-conspirators, Kelvin Welmaker, Jamarr Delmont Welmaker, Julian Acosta, Michael Keith Bowen, Dante Jackson, Randy Dale Jackson and Luis Daniel Marerro, and Antoine Lamar Shirely, **but not Rogel Grant**, are accused of participating in a conspiracy from in or about January 2002, through in or about March 2005, to distribute approximately 30 kilograms of crack." App. 174 (emphasis added).

The district court again emphasized that this charge applied only to co-defendant Shirley when it described the elements of the conspiracy offense. It said:

> To prove conspiracy to distribute crack, as charged in Count 1, the Government must prove the following two essential elements beyond a reasonable doubt.
>
> First, the conspiracy agreement or understanding to distribute crack, as described in the indictment, was formed by two or more persons, and was existing at or about the time charged in the indictment.
>
> And, two, Defendant Antoine Shirley knew the purpose of the agreement, and deliberately joined it with the intent to further its unlawful purpose.

App. 175. Once again, the district court excluded Grant from the conspiracy charge.

Apparently, Grant's argument is that the district court should have used the term "conspirators" in charging the jury concerning the conspiracy count pending against Shirley, and not the term "defendants." However, Grant's argument is premised on a reading of the instruction out of context. When the district court mentioned "defendants" it was obviously referring to the alleged co-conspirators: Kelvin Welmaker, Jamarr

11

Delmont Welmaker, Julian Acosta, Michael Keith Bowen, Dante Jackson, Randy Dale Jackson, Luis Daniel Marerro, and Antoine Lamar Shirley. In fact, at one point, the district court explained: "If the evidence establishes beyond a reasonable doubt that the defendants, or that the co-conspirators, I should say, knowingly . . . ." App. 177. Thus, in the context of the charge as a whole, it is clear that the district court's reference to defendants meant defendant Shirley and the other named defendants, not Grant and Shirley.

Finally, even if it is assumed for argument's sake that the charge was erroneous, Grant, who failed to object to it below, cannot show plain error. He cannot show how the charge affected the jury's verdict. The conspiracy charge against him was dismissed and he was never convicted of conspiracy. Thus, the charge did not violate Grant's substantial rights or result in a miscarriage of justice. *See United States v. Gambone*, 314 F.3d 163, 183 (3d Cir. 2003) (erroneous use of phrase not prejudicial in context of charge as a whole).

Grant also argues that the district court unfairly emphasized the government's case during its summary of the contentions of the parties and the charges in the indictment. We find this argument to be without merit.

A judge is not forbidden from participating in the conduct of a trial. *United States v. Wilensky*, 757 F.2d 594, 597 (3d Cir. 1985). However, the judge must not "abandon his proper role and assume that of an advocate." *United States v. Green*, 544 F.2d 138,

12

147 (3d Cir. 1976). "The judge's participation must never reach the point where 'it appears clear to the jury that the court believes the accused in guilty.'" *United States v. Nobel*, 696 F.2d 231, 237 (3d Cir. 1982) (citation). Each case must be evaluated on its own facts to determine whether the district court's conduct was so prejudicial as to deprive the defendant of a fair trial as opposed to a perfect trial. *United States v. Beaty*, 722 F.2d 1090, 1093 (3d Cir. 1983).

Here, the district court recognized and adhered to these limitations. It carefully explained to the jury the limited purpose for the summary and made it clear that it did not intend to intrude upon the jury's fact-finding role. It said:

> I'm not going to review all of the evidence with you, or summarize it, or attempt to summarize all of it. The trial was relatively short, and you have been an attentive jury. Moreover, the attorneys have extensively reviewed the evidence in their closing arguments. It is your duty to recall all of the admissible evidence, which has been presented, and I instruct you to do so.
>
> However, I will review with you some of the contentions – I will review with you some of the contentions of the parties in this case, in order to give you a context in which to better understand the principles of law, which must guide you in your deliberations, and in which I will instruct you.
>
> I do not intend to summarize all of the contentions and counter-contentions of the parties, but only some of the contentions of each party. Time will not permit me to discuss in detail every major and minor contention of the parties in this case. If I do not cover some of the contentions, that does not mean that those contentions are unimportant. It is your duty to recall, as best you can, all of the contentions and admissible evidence which has been presented, and I instruct you to do so.
>
> If your recollection of any of the contentions of the parties, or any portions of the evidence differs with my summary, disregard what I have said, and rely upon your own memory of those contentions and that evidence, not

13

mine.

> I would not intentionally misstate the evidence, or the contentions of the parties. However, it is your recollection of the evidence, and the contentions, on which you must rely, not mine.

> Finally, in summarizing the contentions of the parties, I am not attempting to indicate, by inference or otherwise, which contentions to accept or reject, which evidence to believe or disbelieve, or what verdict to render. Determining each of those things is your function, not mine, and you would be mistaken if you felt I were indicating any preference in those regards.

App. 158-59.

The district court then began each contention with the prefatory statements "the government contends" or "the government avers." It is apparent, viewed in this context, that the comments to which Grant objects are merely the government's contentions. Indeed, the one sentence to which Grant points as evidence of the district court's alleged bias is simply a statement of one of the government's claims. In that sentence, and the one before it, the district court said:

> The government contends that Defendant Grant delivered the order of crack that day [October 26, 2004] to the police informant and an undercover Berks County detective, in the Burger King parking lot in Reading. This time, however, Rogel Grant was arrested.

App. 161.

Viewed in the context of the district court's cautionary statements at the beginning of the summary of the contentions and the statement in the preceding sentence, this remark is plainly intended to be a part of the court's summary of the government's contentions and not an expression of the court's opinion. Indeed, the implication that the

14

district court's statement "this time, however, Rogel Grant was arrested" implied that Grant was involved in the earlier transactions is refuted by Grant's acquittal of two of the three distribution charges involving sales alleged to have occurred on earlier dates.

Finally, the district court's comments were not one-sided. After summarizing the government's contentions, the district court reviewed in detail Grant's position on each of the crimes charged and highlighted all the alleged deficiencies in the government's evidence. App. 165-67.

For all these reasons, it is clear that the district court did not unfairly emphasize the government's case.

## C. The District Court Erred In Making Findings Regarding Grant's Criminal History.

Grant contends that the district court improperly found that he was subject to the enhanced penalties pursuant to 21 U.S.C. § 841(b)(1)(A) based on his history of at least two prior convictions for unrelated drug offenses.[5] As set forth in the government's information charging prior offenses, Grant had three prior state drug distribution convictions arising from three separate arrests, resulting in three prosecutions under three separate, unrelated docket numbers. Grant does not dispute the validity of the prior convictions. Instead, he argues that the existence of prior unrelated felony drug

---

[5]Section 841(b)(1)(A) provides in relevant part: "If any person commits a violation of this subparagraph [prohibiting the distribution of 50 grams or more of cocaine base] . . . after two or more prior convictions for a felony drug offense have become final, such person shall be sentenced to a mandatory term of life imprisonment without release . . . ."

15

convictions which increase a statutory maximum or mandatory minimum term must be proven to a jury beyond a reasonable doubt. He concedes that his argument is contrary to the presently established law. In *Almendarez-Torres v. United States*, 523 U.S. 224, 239-44 (1998), the Supreme Court held that the fact of a prior conviction, which increases the statutory maximum sentence, may be determined by the judge at sentencing and need not be alleged in the indictment or established as an element of the offense. And, we have acknowledged the continuing authority of *Almendarez-Torres*, even after *United States v. Booker*, 543 U.S. 220 (2005), in *United States v. Ordaz*, 398 F.3d 236, 241 (3d Cir. 2005), where he held that the use of judge-found facts concerning prior convictions does not violate the Sixth Amendment.

Nevertheless, he argues that "permitting a district court to determine whether a defendant's prior sentences are related violates the requirement of Apprendi v. New Jersey that any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury." Grant's Br. at 35. However, he has no authority to support that argument. Indeed, *Apprendi v. New Jersey*, 530 U.S. 466 (2000), does not apply to this case at all. In *Apprendi*, the Supreme Court held: "Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Id*. at 490. Here, the penalty for a violation of 21 U.S.C. § 841(a)(1), involving 50 grams or more of cocaine base, where no prior convictions are alleged, is "not less that 10 years

16

or more than life." 21 U.S.C. § 841(b)(1)(A). The effect of the government's § 851 notice was to raise the mandatory minimum to life imprisonment; however, the maximum was unaffected. Grant argues that where the "statutory minimum punishment is life in prison . . . there is no basis for distinguishing between enhancements that increase the maximum, versus the minimum, punishment." Grant's Br. at 37 n.4. However, the case law is to the contrary. The Supreme Court has held that a judge, rather than a jury, may make factual findings which determine a statutory mandatory minimum sentence (within the maximum sentence allowed by the jury's verdict). *Harris v. United States*, 536 U.S. 545 (2002). And, we have held that his rule "remains binding law in the wake of the *Booker* decision." *United States v. Williams*, 464 F.3d 443, 449 (3d Cir. 2006).

Accordingly, we find this argument to be without merit.

### D. The Sentence Is Unreasonable.

In his Supplemental Brief, Grant contends that the "district court erred in sentencing [him] to an unreasonable sentence based upon improperly harsh penalties for involvement with crack cocaine." Grant's Supplemental Br. at 11. However, Grant offers no explanation as to how or why the sentence was unreasonable other than to just assert it as a fact.

### III.

For all of the above reasons, we will affirm the district court's judgment of conviction and sentence.

17